UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY KUCHARSKI,

     Plaintiff,                      Civil Action No. 12-12958

           v.                   District Judge Lawrence P. Zatkoff
                             Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Kelly Kucharski brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On March 30, 2009, Plaintiff applied for DIB and SSI, alleging disability as of July 15, 2008 (Tr. 130-140). After the initial claim denial, Plaintiff requested an administrative hearing, held on October 20, 2010 in Fort Gratiot, Michigan (Tr. 43). Administrative Law

Judge ("ALJ") Teresa L. Hoskins Hart presided.  Plaintiff, represented by attorney Larry Maitland, testified (Tr. 48-72), as did Vocational Expert ("VE") John Stokes (Tr. 72-79).  On December 20, 2010, ALJ Hart found Plaintiff not disabled (Tr. 38).  On June 26, 2012, the Appeals Council denied review (Tr. 1-7).  Plaintiff filed the present action on July 5, 2012.

### BACKGROUND FACTS

Plaintiff, born December 30, 1970, was just 10 days short of her 40th birthday at the time of the administrative decision (Tr. 38, 130).  She completed high school in 1988 (Tr.186).  She  worked previously as an assembler and cashier (Tr. 165).  She alleges disability as a result of depression, anxiety, an obsessive compulsive disorder ("OCD"), anger management problems, hallucinations, memory problems, seizures, and "possible" Carpal Tunnel Syndrome ("CTS") (Tr. 178).

**A.  Plaintiff's Testimony**

 Plaintiff offered the following testimony:

Plaintiff worked as a gas station cashier between 1989 and 1999 during which time she received a promotion to assistant manager (Tr. 48-49).  Her responsibilities as an assistant manager included completing paperwork, counting inventory, and scheduling other employees (Tr. 49-50).  She also worked as a cashier for a fast food restaurant (Tr. 52).  Her most recent job required her to work on an assembly line (Tr. 53-54).

Plaintiff denied working since July 15, 2008 but admitted that she had since completed "all kinds of online applications" for work at "Blockbuster, Kroger's, Art Van

Furniture, . . . [and] Kmart" (Tr. 56).  Her last online application was completed two months before the hearing (Tr. 58).  She had not been contacted by any of the prospective employers (Tr. 57).  On a typical day, she arose anytime between 10:00 a.m. to 1:00 p.m. (Tr. 57).  Upon arising, she took her medication, then made telephone calls, watched television and performed household chores (Tr. 57).  She liked talk shows, sitcoms, and medical and crime dramas (Tr. 58).  Her boyfriend helped her with her household chores (Tr. 57).  Plaintiff's daughter, 18, lived with Plaintiff on a sporadic basis (Tr. 57-58).  Plaintiff used the internet to communicate with friends on Facebook and read the news (Tr. 59).  She was able to perform grocery shopping chores without help but did not currently drive (Tr. 59).  Her time with her boyfriend was spent listening to music and watching movies (Tr. 60).

Plaintiff alleged that mood swings prevented her from working (Tr. 61).  She also experienced OCD, hip problems, cracking of the shoulder joints, and eye pain and swelling (Tr. 61).  Symptoms of OCD prevented her from the timely completion of her work assignments as an assembler (Tr. 62).  Wrist pain and arm weakness created problems lifting a liquid-filled pot (Tr. 62).

In response to questioning by her attorney, Plaintiff stated that she had not received psychiatric counseling in the past 18 months due to insurance limitations (Tr. 62).  Her mood swings were exacerbated by the presence of others (Tr. 63).  She experienced difficulty following a conversation with a friend due to her tendency to daydream (Tr. 64).  She visited her mother two or three times a month (Tr. 64).  She was discharged from the fast food position after expressing anger to a coworker (Tr. 65).  She experienced difficulty performing

-3-

the assembler positions due to crying jags (Tr. 64). She experienced seizures approximately once every two months for 10 to 20 minutes at a time, adding that she was able to predict the onset of a seizure (Tr. 65). The seizures were characterized by a racing pulse and slurred speech (Tr. 66). She denied losing consciousness during seizures (Tr. 66, 71). She currently took medication for pain and psychological problems (Tr. 67). Her boyfriend reminded her to take her medications (Tr. 67). She admitted that EMG testing for CTS had been negative (Tr. 68). Hypertension created the symptoms of headaches, dizziness, and flushing (Tr. 69). She attempted to relieve headaches with Vicodin, cold compresses, and massage (Tr. 70).

### B.  Medical Evidence[1]

### 1.  Treating Sources

October, 2007 imaging studies of the thyroid gland were negative for masses or cysts (Tr. 284). Plaintiff was treated for calluses of the feet in January, 2008 (Tr. 231). March, 2008 treating notes by Zivit Cohen, M.D. state that Plaintiff experienced suspected gastritis (Tr. 249). In April, 2008, treating records state that Plaintiff experienced a seizure (Tr. 246). Upon admittance to the hospital, she exhibited high blood pressure readings (Tr. 247). She was diagnosed with a seizure disorder (Tr. 247). An EEG of the brain was unremarkable (Tr. 343-345). The same month, Plaintiff sought treatment for symptoms of internal hemorrhoids and weight loss (Tr. 234-235). Akash Sheth, M.D. noted that Plaintiff exhibited a normal gait and a full range of motion (Tr. 235). She appeared fully oriented

---

[1]Records pertaining to Plaintiff's condition prior to the amended onset of disability date of July 15, 2008 are included for background purposes only.

with a good remote and recent memory (Tr. 235).  An ultrasound of the abdomen was negative for abnormalities (Tr. 238, 282).  A colonoscopy also showed unremarkable results (Tr. 240).  Yi C. Sul, M.D. recommended that Plaintiff abstain from alcohol (Tr. 353).  In May, 2008, Dr. Sul noted that Plaintiff did not experience seizures between 2003 and the previous month (Tr. 352).  He found that substance abuse should be considered as a possible cause of seizure activity (Tr. 351).  June, 2008 imaging studies of the cervical spine showed "[n]o evidence of acute fracture or significant degenerative change" (Tr. 274, 276).  A CT of the brain showed "minimal hyperdensity" (Tr. 278).

In January, 2009, Plaintiff reported that she was cutting herself (Tr. 244).  The following month, intake notes by New Oakland Child-Adolescent and Family Center show a GAF of 65[2] (Tr. 324).  March, 2009 treating notes by bone and joint specialist Rafia Khalil, M.D. state that Plaintiff reported hand and wrist pain (Tr. 268).  April, 2009 optical records state that Plaintiff was currently taking Depakote (Tr. 291).  The same month, counseling notes by New Oakland Child-Adolescent and Family Center state that Plaintiff was currently cutting herself (Tr. 300).  Plaintiff reported legal problems (Tr. 302).  Treating notes from the following month state that she presented as sober but smelled strongly of alcohol (Tr. 302).  The following month, she was referred for crisis management services (Tr. 300).  A

---

[2]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. GAF scores in the range of 61-70 indicate "some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning." *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-TR*" ), 32 (4th ed.2000).

CT of the abdomen from the same month was unremarkable (Tr. 338). An MRI of the cervical spine showed mild canal stenosis at C4-5 and C5-6 but no other abnormalities (Tr. 347). An MRI of the brain showed bilateral proptosis requiring clinical correlation but was otherwise unremarkable (Tr. 349-350). The same month, treating notes by neurologist Alicia G. Lumley, M.D. state that Plaintiff was observed using alcohol upon leaving the appointment (Tr. 355). August and November, 2009 CTs of the head and brain showed that Plaintiff's condition was stable (Tr. 431, 433). December, 2009 EMGs were negative for CTS in both arms (Tr. 429).

In January, 2010, a CT of the brain showed the effects of antiseizure therapy but was otherwise unremarkable (Tr. 456). In February, 2010, Plaintiff reported bilateral arm and knee pain, requesting a refill of Vicodin (Tr. 409). In June, 2010, Plaintiff reported that her shoulder cracked upon movement (Tr. 408). Dr. Lumley, noting Plaintiff's ongoing alcohol abuse, encouraged her to quit drinking (Tr. 419). July, 2010 treating notes by Dr. Lumley state that Plaintiff "look[ed] better" after abstaining from alcohol (Tr. 418). Imaging studies of the right foot showed minor osteoarthrosis but no other abnormalities (Tr. 416). A CT of brain showed no evidence of a hematoma (Tr. 422). August, 2010 treating notes by ophthalmologist Edward M. Cohn, M.D. note that Plaintiff showed thyroid induced changes to the eye but 20/25 readings with normal peripheral vision (Tr. 402). Examination notes created the same month by Orthopedic Associates of Port Huron state that Plaintiff experienced limitations in range of neck motion but tests for a rheumatoid factor were negative (Tr. 439). She was diagnosed with "early" cervical radiculopathy (Tr. 439). The

same month, an outpatient diagnostic arthroscopic knee procedure was performed without complications (Tr. 449-450).

The following month, imaging studies of the eyes showed symptoms of hypothyroidism (Tr. 441, 448).  Also in September, 2010, Plaintiff consented to inpatient psychiatric treatment after cutting herself and expressing suicidal ideation (Tr. 464).  She acknowledged that she was intoxicated at the time she cut herself (Tr. 464, 467).  She was diagnosed with major depression (Tr. 466).  Four days after admittance, Plaintiff presented with a bright affect, indicating that cutting herself was "a big mistake and part of that was due to drinking" (Tr. 471, 474).  She was discharged the following day (Tr. 470).  Despite Plaintiff's reports of tremors, seizures, spasms, and weakness, neurologist Demian Naguib, M.D. found no objective evidence of motor, sensory, or nerve deficits (Tr. 483).  An MRI of the spinal cord showed a "suspected" herniated disc at C5-C6 without nerve root involvement and a mild disc bulge at T11-12[3]  (Tr. 484, 519).

## 2.  Non-Treating Sources

 In September, 2009, psychologist Christian Barrett performed a mental examination of Plaintiff on behalf of the SSA (Tr. 357-361).  Plaintiff reported short-term memory problems and seizures occurring several times each month (Tr. 357).  Dr. Barrett noted that Plaintiff was charged with driving under the influence of alcohol in 2000 and in 2009 spent

---

[3]Transcript page 519 was not considered by the ALJ but made part of the record by the Appeals Council (Tr. 6).

37 days in jail for disorderly conduct (Tr. 357-358). Plaintiff reported that her boyfriend completed all the household chores because she did not "'have any motivation'" (Tr. 358). She reported difficulty sleeping (Tr. 359). She denied hallucinations but stated that she experienced bouts of depression (Tr. 359). She admitted that due to drinking binges, she experienced blackouts and tremors in 2000 (Tr. 359). She appeared fully oriented with poor short-term memory (Tr. 360). Dr. Barrett noted "mild functional restrictions . . . in her ability to understand, . . . carry out and remember instructions" (Tr. 361). He assigned Plaintiff a GAF of 55-60 with a "fair-guarded" prognosis[4] (Tr. 361).

The same month, Dr. Fred Greaves performed a non-examining Psychiatric Review Technique on behalf of the SSA, showing the presence of affective, anxiety, and personality disorders (Tr. 366, 369, 371, 373). Under the "'B' Criteria," Dr. Greaves found the presence of moderate difficulties in maintaining social functioning and mild difficulties in activities of daily living and concentration, persistence, or pace (Tr. 376). Dr. Greaves also completed a Mental Residual Functional Capacity Assessment, finding moderate limitations in the ability understand, remember, and carry out detailed instructions; perform work activities within a schedule; concentrate for extended periods; accept criticism for supervisors; get along with coworkers; maintain appropriate behavior, and respond to workplace changes (Tr. 362-363). He opined that Plaintiff's psychological symptoms were due in large part to

---

[4]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-TR*"), 34 (4th ed.2000).

alcohol abuse, finding that her symptoms would be non-severe is she abstained (Tr. 364). Dr. Greaves concluded that Plaintiff could perform simple, repetitive tasks (Tr. 364).

Also in September, 2009, R. Scott Lazzara, M.D. performed a physical examination of Plaintiff on behalf of the SSA (Tr. 383).  Plaintiff denied the ability to lift more than 10 pounds or walk for more than two blocks but was able to cook (Tr. 381).  Dr. Lazzara noted that her vision was 20/30 in both eyes with corrective lenses (Tr. 382).  He observed that she exhibited a full range of motion in all joints with normal motor strength and muscle tone (Tr. 382).  The following month, Glen Douglass, M.D. completed a Physical Residual Functional Capacity Assessment, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 385).  He found Plaintiff capable of frequent balancing, stooping kneeling, crouching, crawling, and climbing of ramps and stairs, but precluded from all ladder, rope, and scaffold climbing (Tr. 386).  Due to symptoms of CTS, he limited Plaintiff to frequent handling and fingering (Tr. 387).  He found that Plaintiff should avoid even moderate exposure to vibration and avoid any exposure to hazards such as machinery and heights (Tr. 388).  Citing Plaintiff's continued ability to cook, shop, and perform laundry chores, Dr. Douglass found her allegations of limitation "not fully credible" (Tr. 389).

In May, 2012, Plaintiff submitted an undated letter by her friend Karla Galli[5] (Tr. 219-221).  Galli stated that Plaintiff had gone "downhill physically and mentally" in the past 10

---

[5] This letter was made part of the record by the Appeals Council.  *See* ft. 3, above.

years (Tr. 220). Galli stated that Plaintiff experienced dizziness, paranoia, memory loss, and knee and hand problems (Tr. 220-221).

### 2. Material Submitted Subsequent to the ALJ's December 20, 2010 Decision

On February 10, 2009, a psychiatric report created by Sarva Sarvananda, M.D. of New Oakland Child-Adolescent and Family Center noted episodes of OCD, depression, anxiety, and memory problems. *Docket #16* at pg. 28 of 38. He assigned Plaintiff a GAF of 45[6]. Dr. Sarvananda also completed a mental functional capacity assessment, finding that Plaintiff experienced marked impairment in concentration, social interaction, and adaptation. *Id.* at pgs. 29-30. Dr. Sarvananda stated that he examined Plaintiff once on February 3, 2009. *Id.* at 28. In November, 2009, Fremont L. Scott, D.O., noting Plaintiff's complaints of knee pain, found the absence of fractures, dislocation, or subluxation[7] (Tr. 495, 502, 504). In May, 2010, Plaintiff reported renewed left knee pain (Tr. 493). Plaintiff demonstrated a "patellofemoral grind" but exhibited a normal range of motion (Tr. 493). In July, 2010, Dr. Scott noted that x-rays did not show abnormalities of the left knee (Tr. 492). In September, 2010, Plaintiff reported knee pain at the incision site of a recent arthroscopic procedure (Tr. 490). Treating notes by Dr. Scott from the following month state that physical therapy was discontinued after Plaintiff complained of continued knee pain (Tr. 490). A November, 2010

---

[6]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-TR*" ), 34 (4th ed.2000).

[7]The "Sentence Six" material duplicating evidence considered by the ALJ has been omitted from mention in this section.

MRI of the shoulder showed only mild cystic changes (Tr. 511).  A followup study of the

right shoulder showed mild osteoarthritic changes and mild supraspinatus atrophy (Tr. 512,

518).  An EEG conducted the same month found the absence of pathology.  *Docket #16* at

pg. 35 of 38.

### C.  Vocational Expert Testimony

VE John Stokes categorized Plaintiff's past relevant work as a small products

assembler as unskilled at the light exertional level (heavy as performed by Plaintiff); motor

vehicle assember, unskilled/medium (light as performed); cashier, unskilled/light; cashier

checker, semiskilled/light (heavy as performed); and assistant manager, semiskilled/medium

(Tr. 74-75).[8]   The ALJ posed the following set of hypothetical limitations to the VE, taking

into account Plaintiff's age, education, and past relevant work:

> [A]ssume the individual has a capacity for light exertion, but can never climb
> ladders, ropes, or scaffolds; but can frequently perform the other postural
> functions; and no more than frequently perform handling and fingering with
> the upper extremities as far as the manipulative limitation.   And
> environmentally the person could not work in environments with exposures –
> any exposures – to hazards such as unprotected heights, or moving machinery,
> or work around moderate exposures to vibrations.   Would such a hypothetical
> individual be able to perform the claimant's prior work experience? (Tr. 76).

---

[8]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

The VE testified that given the above limitations, the individual would be able to perform Plaintiff's past relevant work as a small products assembler (as customarily performed); the cashier positions and fast food restaurant work (as actually and customarily performed); and motor vehicle assembly work (as actually performed only) (Tr. 76).

The VE testified that if the same individual were additionally limited by moderate limitations in social interactions with coworkers (allowing for superficial contact only), the position of motor vehicle assembler would be eliminated from the above findings (Tr. 76-77). The VE testified that moderate limitations in maintaining attention and concentration would not change his response (Tr. 77). He stated that if the same individual were required to take unscheduled breaks of 30 minutes each workday, all competitive work would be eliminated (Tr. 78).

## D.    The ALJ's Decision

Citing the medical records, the ALJ found that Plaintiff experienced the severe impairments of "alcohol abuse with a history of seizure-like events, mood disorder, anxiety disorder, personality disorder, degenerative disc disease of the cervical spine and polyarthralgias" but that none of the conditions met or equaled any impairment listed in 20 CRF Part 404, Subpart P, Appendix 1 (Tr. 23-24). The ALJ found the conditions of hypertension and hypothyroidism non-severe (Tr. 30). She determined that Plaintiff experienced moderate restriction in social functioning and mild restriction in activities of daily living and concentration, persistence, or pace (Tr. 32). The ALJ found that Plaintiff

-12-

retained the residual functional capacity ("RFC") for light work with the following additional

limitations:

> [C]laimant can never climb ladders, ropes or scaffolds but can frequently
> perform all other postural limitations. She is restricted to no more than
> frequent fingering and handling with the upper extremities. The claimant
> could not work in environments with any exposures to hazards, such as
> unprotected heights and moving machinery, or moderate exposures to
> vibrations. The claimant has a moderate limitation for interaction with co-
> workers that would restrict her to no more than occasional and superficial
> interaction with co-workers (Tr. 33).

Citing the VE's testimony, the ALJ found that Plaintiff could perform her past relevant work

as a small parts assembler, fast food cashier, and gas station cashier (Tr. 37).

The ALJ discounted the allegations of disability, noting that in recent months,

Plaintiff had not sought psychological treatment (Tr. 35). She cited treating records showing

that Plaintiff's ongoing alcohol abuse contributed to her psychological problems (Tr. 26-27).

In support of the Step Four finding, the ALJ also cited Plaintiff's admitted ability to perform

light household chores, follow television dramas, apply for jobs online, and sustain a

relationship with her boyfriend (Tr. 34). She noted that Plaintiff's claims of knee, back, and

arm pain were undermined by examination reports showing a full range of motion (Tr. 35).

### STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether

it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and

Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a

scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight."  *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## **FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment

listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  Substantial Evidence Supports the ALJ's Determination

Plaintiff, now proceeding *pro se*, argues that the ALJ mis-characterized the testimony and treating records.  *Plaintiff's Brief, Docket #16.*  She contends that her ability to watch movies and perform crossword puzzles does establish non-disability, noting that "these hobbies are part of [her] stress management" for symptoms of anxiety, OCD, and depression. *Id.* at 1-2 (citing Tr. 34).  Plaintiff disputes the finding that her foot problems ended when she had calluses removed in 2007, noting that she later had a bunion removed from her right foot. *Id.* at 1 (citing Tr. 30).  She also faults the ALJ for citing the ability to spend time online, contending that the ALJ ought to have asked her about "how many times" she was required "to rest and massage [her] aching hands and wrists."  *Id.* at 2 (citing Tr. 32).

The pleadings of a *pro se* litigant are to be liberally construed. *See Martin v. Overton,* 391 F.3d 710, 712 (6th Cir.2004), citing *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Herron v. Harrison,* 203 F.3d 410, 414 (6th Cir.2000) (*pro se* pleadings are held to "an especially liberal standard").  Further, in Social Security cases, the

failure to submit a brief or full blown legal arguments  "[are] not a prerequisite to the Court's reaching a decision on the merits" or a finding, *sua sponte,* that  grounds exist for reversal. *See Wright v. Commissioner of Social Sec. WL* 5420990, *2-3 (E.D.Mich.2010) (Friedman,J.).

Plaintiff's arguments do not provide a basis for remand.  Her testimony that she watched a variety of television shows and spent her leisure time listening to music and watching movies with her boyfriend was unaccompanied by any indication that she engaged in these activities for "therapy" (Tr. 57, 60).  The fact that Plaintiff had a bunion removed subsequent to foot treatment in 2008 does not, by itself, invalidate the ALJ's finding that foot problems were non-severe.  Dr. Lazzara's September, 2009 findings include his observation that Plaintiff did not exhibit problems heel and toe walking (Tr. 382).  In April, 2008, Dr. Sheth observed that Plaintiff had a normal gait (Tr. 235).  None of the treating source records state that she required an ambulatory device.  August, 2010 records state that testing for the rheumatoid factor was negative (Tr. 439).

Although represented by counsel at the hearing, Plaintiff did not offer testimony that she was often required to stop and massage her hands while using a computer keyboard.  Notwithstanding the duty to develop the record, ALJ's are not expected to be "telepathic or resort to divination." *Banuelos v. Chater,* 103 F.3d 137, 1996 WL 681261, *1 (9th Cir. November 22, 1996)(unpublished).  As such, the ALJ was not required to elicit testimony pertaining to restrictions in keyboarding or other unarticulated limitations.  The fact that Plaintiff was also questioned by her own attorney undermines her argument that the ALJ's development of the testimony was incomplete. *See Delgado v. Commissioner of Social Sec.,*

30 Fed.Appx. 542, 549, 2002 WL 343402, *6 (6ᵗʰ Cir., March 4, 2002)(citing *Sears v. Bowen,* 840 F.2d 394, 402 (7th Cir.1988))("ALJ is entitled to presume that a claimant who was represented by counsel has made his best case").   Contrary to Plaintiff's present position, her hearing testimony supports the finding that she was able to perform her own grocery shopping, despite the fact that she was required to get a ride from her mother to and from the store (Tr. 59-60).

      The ALJ's finding that Plaintiff's psychological symptoms were largely due to alcohol abuse is also strongly supported by the record (Tr. 34).   In April, 2008, Dr. Sul recommended that Plaintiff abstain from alcohol use due to seizure activity (Tr. 353).   April, 2009 counseling records state that Plaintiff smelled strongly of alcohol (Tr. 302).   Dr. Lumley's treating notes state that Plaintiff was observed drinking upon leaving an appointment (Tr. 355).   She observed later that Plaintiff "look[ed] better" while abstaining from alcohol (Tr. 418).   Dr. Suh also advised Plaintiff to quit drinking, noting a possible correlation between drinking and seizure activity (Tr. 351).   "[T]he social security administration must deny a claim for benefits if drug addiction or alcohol is a contributing factor material for a finding of disability. *Siemon v. Commissioner of Social Sec.* 72 Fed.Appx. 421, 422, 2003 WL 21961553, *1 (August 15, 2003); 42 U.S.C. § 423(d)(2)(c).

      Plaintiff also contends that the absence of psychological treatment for the 18 months before the hearing was improperly cited in support of the non-disability finding.   *Plaintiff's Brief* at 2.   She argues that she tried but failed to obtain mental health treatment during that

-17-

time. First, her claim is somewhat undermined by her ability to receive frequent and comprehensive care for her physical conditions during the same period. However, even assuming that Plaintiff was truly unable to obtain psychological care, the ALJ's mental RFC, based on her conclusion that Plaintiff's psychological problems were of only mild or moderate severity but for the alcohol abuse, is well supported by the transcript as a whole (Tr. 33). September, 2009 consultative records state that Plaintiff appeared fully oriented (Tr. 360). April, 2008 treating records state that she had a good memory (Tr. 235). Her acknowledgment that a September, 2010 cutting incident was attributable to alcohol abuse further supports this finding (Tr. 471, 474). While she presently disputes the conclusion that alcohol use contributed to her psychological symptoms, the ALJ's conclusions are well supported by the treating records.[9] *Plaintiff's Response* at 2*, Docket #24.* Finally, although she is proceeding *pro se* in this action, I note that her alleged limitations in memory and concentration did not prevent her from compiling relevant evidence or making cogent and thorough arguments in support of her claim.

### B.  Later-Submitted Material Not Reviewed by the Appeals Council

Plaintiff also argues that evidence submitted subsequent to the ALJ's decision supports the disability claim. *Plaintiff's Brief* at 1.

---

[9]

Plaintiff cites Dr. Suh's May, 2008 treating note stating "Rule out substance abuse" to argue that Dr. Suh had determined that substance abuse was not a cause of her seizures. *Plaintiff's Response* at 2. However, this statement, read in the context of his report indicates that substance abuse had *not* been eliminated as a possible cause of the seizures (Tr. 351).

-18-

Where the Appeals Council denies a claimant's request for a review of his application based on material presented subsequent to the ALJ's decision, the district court cannot consider that new evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Cotton v. Sullivan,* 2 F.3d 692, 695-696 (6th Cir.1993).  Sentence six of 42 U.S.C. § 405(g) states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ..."  Hence, this Court may consider the additional evidence only for purposes of determining whether remand is appropriate under the sixth sentence of § 405(g).

In this case, the "Sentence Six"material consists of transcript pages 489-518 and exhibits attached to Plaintiff's motion for summary judgment.  A number of these records simply duplicate evidence already considered by the ALJ and thus do not support Sentence Six remand.  To show that the newer evidence is "material," the plaintiff "must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence" *Sizemore v. Secretary of Health & Human Services,* 865 F.2d 709, 711 (6th Cir.1988).  While this material also includes a number of  treating records stating that Plaintiff reported left knee pain, the accompanying objective studies and diagnostic test results do not support greater restrictions than those found in the RFC (Tr. 492-493, 495, 502, 504).  Likewise, imaging studies of the

shoulder taken in November, 2010 and January, 2011 showing only mild findings and an unremarkable EEG do not support a more stringent RFC (Tr. 512, 518), *Docket #16* at pg. 35 of 38.

A February 3, 2009 evaluation by Dr. Sarvananda of New Oakland Child-Adolescent and Family Center is a closer call.[10]   A mental functional capacity assessment Dr. Sarvananda completed on behalf of a state claim for disability states that Plaintiff experienced marked impairment in concentration, social interaction, and adaptation.[11]   *Docket #16* at pgs. 29-30. Nonetheless, these findings would be unlikely to change the administrative decision.  First, Dr. Sarvananda's assessment, based on a one-time examination, is not entitled to the deference accorded a treating physician.  *See Kornecky v. Commissioner of Social Security,* 167 Fed.Appx. 496, 506, 2006 WL 305648, *8 (6th Cir. February 9, 2006).  Regardless of whether Dr. Sarvananda oversaw Plaintiff's subsequent treatment, at the time of the evaluation he had only examined Plaintiff once.  *Docket #16* at 28.  The "relevant inquiry is not whether [the treating physician] might have become a treating physician in the future," but rather,  whether [he] had the ongoing relationship . . . *at the time he rendered his opinion.*

---

[10]Although Plaintiff has not articulated a "good cause" for the tardy submission of this evaluation, the transcript shows that these records were first requested on April 20, 2009 on behalf of the disability claim, well before the ALJ's December, 2010 decision (Tr. 296).  "New Oakland's" failure to timely produce the requested material constitutes good cause.

[11]

A finding of at least two "marked" limitations under the "'B' Criteria" of either Listing  12.04 or 12.06 would result in a finding of disability at Step Three of the ALJ's sequential analysis.   20 C.F.R. Pt. 404, Subpt. P, App. 1, §§12.04, 12.06.

*Id.* (emphasis in original).

Further, while the ALJ did not consider Dr. Sarvananda's assessment, she commented on intake notes created in the same period by a "New Oakland" therapist, noting that the GAF scores upon discharge were inexplicably lower than at the time of Plaitiff's intake seven days earlier[12] (Tr. 26, 35). Even assuming that the ALJ had fully credited Dr. Sarvananda's finding of marked limitations, the evaluation does not show that Plaintiff experienced that degree of psychological impairment for the 12-month durational period required to establish entitlement to benefits. Notably, her psychological treating records end in April, 2009 and do not resume until a five-night inpatient stint in September-October, 2010 precipitated by alcohol abuse. As discussed above, substantial evidence, culled from various treating records, generously supports the RFC crafted by the ALJ. Dr. Sarvananda's one-time evaluation would thus be unlikely to change the administrative determination. Accordingly, I recommend that the District Court decline to remand the case for the consideration of the newer records.

In closing, it should be noted that the recommendation to uphold the Commissioner's decision is not intended to trivialize Plaintiff's personal problems or well documented struggles with alcohol abuse. However, based on a review of this record as a whole, the ALJ's decision is well within the "zone of choice" accorded to the fact-finder at the

---

[12]

The ALJ criticized the New Oakland Child-Adolescent Family Center findings on the basis that they were created by a therapist rather than a psychologist or psychiatrist (Tr. 35). However, she provided an independent basis for the rejection of these findings, noting that if the "New Oakland" records were credited, Plaintiff's psychological did not improve, but actually deteriorated over the course of her one-week residential treatment  (Tr. 35).

administrative hearing level, *Mullen v. Bowen*, *supra*, and should not be disturbed by this Court.

**CONCLUSION**

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

 Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated  July 26, 2013          s/ R. Steven Whalen
                              R. STEVEN WHALEN
                              UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record on July 26, 2013, electronically and/or by U.S. Mail.


                              s/Michael Williams
                              Relief Case Manager for the
                              Honorable R. Steven Whalen